**Terry THOMPSON, etc., Plaintiff,**

v.

**T. F. I. COMPANIES, INC., et al., Defendants.**

**No. 72 C 3105.**

United States District Court, N. D. Illinois, E. D.

Aug. 28, 1974.

---

John P. Biestek, Jr., and John G. O'Brien, Biestek & Facchini, Arlington Heights, Ill., for plaintiff.

Samuel Weisbard and Byron L. Gregory, McDermott, Will & Emery, Chicago, Ill., for defendants T. F. I. Companies, Inc. and Tastee-Freez International.

Wm. D. Maddux, Donald G. Kempf, Jr., and Steven P. Handler, Kirkland & Ellis, Chicago, Ill., for defendant Chicago Tastee-Freez.

## MEMORANDUM OPINION

DECKER, District Judge.

This is an antitrust action under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive and treble damage relief against various corporate entities in the Tastee-Freez franchise system for alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 3 of the Clayton Act, 15 U.S.C. § 14.[1]

The amended complaint alleges that defendants have conspired to restrain and monopolize trade, and have attempted to monopolize or substantially lessen competition in the market for "Tastee Shake Mix and supplies used in and incidental to the preparation and sale of Tastee-Freez, including but not limited to toppings, fountain supplies, paper and plastic containers and utensils, and all foods and related items used in the preparation and sale of Tastee-Freez products." These unlawful objects are alleged to be accomplished by conditioning a license to operate, and thus, the privilege to use the valuable Tastee-Freez trademark and tradename, upon the prospective licensee's agreement to accept contractual provisions requiring him to purchase the foregoing essential products and supplies from the defendants or sources designated by them, and

---

1. Plaintiff also asserts a cause of action under the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, § 60–1 et seq. A claim for punitive damages has previously been ordered stricken from the amended complaint.

by a program of promotion and coercion to enforce those agreements.[2]

Plaintiff purports to bring this action individually and as representative of all persons "similarly situated who have entered into an Operator's License Agreement containing provisions similar to those entered into by plaintiff . . . with one or more of the named defendants."

This court previously has denied defendants' motions to dismiss the amended complaint for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), F.R.Civ.P., and for entry of summary judgment in their favor under Rule 56, F.R.Civ.P. Presently before the court are defendants' motions, pursuant to Rule 23(c), for an order striking the class action allegations of the amended complaint on the ground that this litigation and the named plaintiff do not satisfy the prerequisites for the maintenance of a class action prescribed by Rules 23(a) and 23(b).

■ Resolution of the class action issue here, as in other franchise cases, requires an analysis of the particular questions to be litigated and of the proof that will be required at trial. Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal.1974); Abercrombie v. Lum's, Inc., 345 F.Supp. 387, 390 (S.D.Fla.1972); DiCostanzo v. Chrysler Corp., 57 F.R.D. 495, 498 n. 9 (E.D.Pa. 1972). In addition, some understanding of the Tastee-Freez franchise system, and the relative positions of defendants therein, is necessary to place the parties' contentions in their proper perspective. As indicated by the amended complaint, and as more particularly set forth in an affidavit of the chairman of the board of one of the defendants, the Tastee-Freez franchise system is triple-tiered. At the apex is defendant T.F.I. Companies, Inc., a conglomerate engaged in the business of owning stock in several different types of companies. One of the concerns which it wholly owns is Tastee-Freez International, Inc. ("Tastee-Freez"), an Illinois corporation with its principal place of business in Chicago, Illinois, and sole owner of the Tastee-Freez trademark. Typically, Tastee-Freez enters into agreements with individuals or companies, known as "franchisees", whereby the latter assume responsibility for developing the Tastee-Freez business in a designated geographic territory by arranging for the opening and operation of Tastee-Freez stores therein. In their assigned territories, the area franchisees, not Tastee-Freez, enter into license agreements authorizing the operation of Tastee-Freez establishments; plaintiff is one such "licensee" or "operator". In those territories in which Tastee-Freez does not have an independent franchisee, Tastee-Freez itself enters into license agreements with applicants. Plaintiff is a licensee of defendant Chicago Tastee-Freez Corporation ("Chicago TF"), the area franchisee for four northern Illinois counties.

There are approximately 1300 Tastee-Freez establishments licensed throughout the United States. Of those, about 150 operate in non-franchisee territories under direct license agreements with Tastee-Freez. The remaining 1150 operators function under license agreements with approximately 45 different area franchisees, such as Chicago TF.[3] Approximately 42 licensees, including plaintiff, have contracted with Chicago TF. Thus, more than 1100 of the total 1300 licensees in the purported class appar-

---

2. In some paragraphs of the amended complaint, plaintiff claims that he and the purported class are forced to purchase all of their requirements of the designated products from defendants or their designated sources, while, in other paragraphs, the coercion is alleged to be directed at limiting purchases to defendants alone.

3. None of the other 44 area franchisees is a party to this litigation.

ently have not contracted with either defendant Tastee-Freez or Chicago TF.

With respect to the 190–200 operators who have entered into agreements with Tastee-Freez or Chicago TF, their contracts vary in significant respects. Tastee-Freez has published or prepared 19 different operator's license agreement forms; evidently, all but one has been used in contracting with the 150 operators in the non-franchisee territories. Tastee-Freez has recommended and made available all 19 of these forms to the area franchisees, who use their discretion in utilizing these models in negotiating with prospective licensees. However, the franchisees are not under any obligation to Tastee-Freez to use any particular form of agreement, including the 19 suggested models, in establishing contractual arrangements with their licensees. Tastee-Freez asserts that the only requirements it imposes upon franchisees are that the ultimate license agreements be substantially consistent with the recommended forms and adhere to the provisions in the models concerning quality maintenance, protection of the Tastee-Freez trademark, and calculation of royalties payable to the store operators.[4]

As might be expected from defendant Tastee-Freez' liberality on contract provisions, there exist within the franchise system franchisees which have used the license agreement models supplied by Tastee-Freez without change; there are other franchisees which have used the forms with minor or substantial modification; there are other franchisees which have used their own or other corporate forms of agreement;[5] and there are still other franchisees which have allowed licensees to operate without any written license agreements.

The foregoing recitation, based upon undisputed facts of record, suggests a decided lack of uniformity in the contractual relationships existing between Tastee-Freez and Chicago TF, on one hand, and their licensees, on the other. More significantly, the particular contractual clauses relating to the selection and approval of suppliers—the primary issue in this case—also vary significantly. Five of the 19 Tastee-Freez model forms limit the licensee to "such supplier or suppliers as Franchisee may in writing designate;" however, that same paragraph grants licensees the right to purchase from any other source, provided the products so bought conform to the Tastee-Freez specifications.[6] A second series of forms contains provisions allowing the licensees to use mixes and supplies "that are first approved in writing by [the franchisor]."[7] A third group, which includes the provision ap-

---

4. These royalties are divided between Tastee-Freez and the franchisees.

5. The aforementioned affiant also states that the franchisee in Georgia has used a modified version of a Coca-Cola form contract as the standard license agreement in his territory.

6. The provision in its entirety reads as follows:
   "That to secure the uniformity essential in the operation of Tastee-Freez Establishment, he shall purchase all supplies, food products and equipment from such supplier or suppliers as Franchisee may in writing designate; provided, however, that if he can secure equivalent supplies, food products or equipment conforming to the specifications now or hereafter established

by HARLEE from other than the designated supplier or suppliers, he shall not be obligated to purchase said supplies, food products or equipment from said designated supplier or suppliers."

7. That provision in its entirety reads as follows:
   ". . . to insure the uniformity in quality to the public of said products, Lessee shall use only Tastee-Freez Mix in the aforesaid Feeders, or such other mix of similar ingredients and quality to Tastee-Freez Mix as shall be first approved in writing by Lessor.
   "To use only supplies, including but not limited to, Flavors, Sundae Toppings, Cones, Spoons, all sizes of Containers, Straws, Uniforms, Caps and Signs that are first approved in writing by Lessor."

pearing in the contract between plaintiff and Chicago TF, permits purchases "only from Franchisee or a source designated by Franchisee . . . ."[8] It is noteworthy that nowhere in his amended complaint or memorandum on the class action question does plaintiff contend that approval of alternate sources has been withheld unreasonably.

With this overview of the Tastee-Freez franchise system and the licensing agreements upon which that structure is built, a more confident analysis of the instant motions may be had.

Rules 23(a) and 23(b) set forth the requirements for the maintenance of a class action. Initially, under Rule 23(a), each of the following prerequisites must be satisfied:

1. The class must be so numerous that joinder of all members would be impracticable;

2. There must be questions of law or fact common to the class;

3. The claims or defenses of the representative party must be typical of the claims or defenses of the class;

4. The representative parties must be able fairly and adequately to protect the interests of the class.

In addition, the litigation must fall within one of the three categories of Rule 23(b).

■■ It is well-established that the named plaintiff in a purported class action bears the burden of establishing that his lawsuit meets the prerequisites of Rule 23. See, e. g., Matarazzo v. Friendly Ice Cream Corp., 62 F.R.D. 65 (E.D.N.Y.1974); Glodgett v. Betit, 368 F.Supp. 211, 214 (D.Vt.1973) (citing

cases); Shaw v. Mobil Oil Corp., 60 F. R.D. 566, 568 (D.N.H.1973) (citing cases). Further, the Supreme Court recently has indicated that courts are to adhere strictly to the standards of Rule 23. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

*I. Rule 23(a)*

*A. Rule 23(a)(1): Numerosity*

■ Plaintiff claims that the class consists of the approximately 1300 similarly situated persons who have entered into a license agreement similar to that entered into by plaintiff with one of the defendants. However, this court is of the opinion that the proper class is nowhere near as large as plaintiff would define it. The class should consist only of those who stand in the same position as plaintiff. At the outset, therefore, all those purported class members who do not have contractual relationships with one of the defendants must be eliminated, leaving a class of 190–200 members. North Watkins Tastee-Freez Corp. v. Tastee-Freez Industries, Inc., No. C–70–206 (W.D.Tenn., March 2, 1973) (Memo. Op.). Secondly, in light of plaintiff's contractual arrangement with Chicago TF alone, all but the 41 licensees who, like plaintiff, contracted with Chicago TF must be eliminated. Finally, and more particularly, since plaintiff has not operated a Tastee-Freez store since before the commencement of this lawsuit, it would appear that the proper class must be limited to those 14 persons, including plaintiff, who operated Tastee-Freez establishments during 1972 but no longer do so.

---

8. The provision in its entirety reads as follows:

"That to secure the uniformity essential in the operation of the Tastee-Freez Establishment, to protect the secrecy of the Tastee-Freez formula and to insure that the standards of the quality associated with the Tastee-Freez trademark are met by Licensee, he shall purchase only from Franchisee or a source designated by Franchisee: (i) all of his requirements of Tastee-Freez mix; (ii) supplies used in and incidental to the preparation and sale of Tastee-Freez, including but not limited to toppings, fountain supplies, paper and plastic containers and utensils; (iii) all foods and related items used in the preparation and sale of Tastee-Freez Products."

Moreover, Chicago TF licensees, like those throughout the Tastee-Freez system in general, did not, and do not, all conduct their businesses under the same contractual provisions as did plaintiff. Of the 42 present licensees, 24 operate under the model agreement signed by plaintiff, 13 operate under different forms, and 5 operate without any formal written agreement. Narrowing the focus still further, the 14 former licensees operated ·under one of two agreements, which, defendants concede, contain substantially similar supply provisions.

■ This court does not view 13 additional potential parties plaintiff as "so numerous" to render "joinder of all members . . . impracticable." Rule 23(a)(1). Even considering the class as encompassing, in addition, the 42 present Chicago TF licensees would not necessarily compel class certification. Courts have denied, or stated that they would deny, certification to classes of even larger numbers. See, e. g., Van Allen v. Circle K Corp., 58 F.R.D. 562, 564 (C.D.Cal.1972); Seligson v. Plum Tree, Inc., 61 F.R.D. 343, 346 (E.D.Pa. 1973); Winokur v. Bell Federal Savings & Loan Ass'n, 16 F.R.Serv.2d 65 (N.D. Ill.1972).

However, this court need not rest its decision upon the manageability problem presented by such a class size alone. For, regardless of whether the class is denominated as the 14 former Chicago TF licensees, as this court believes it should, or, in addition, the 42 present licensees of Chicago TF, or even the 190–200 licensees of both Chicago TF and Tastee-Freez, other factors exist to render a class action inappropriate for this litigation.

### B. Rule 23(a)(2): Common Questions of Law or Fact

To establish an unlawful tying arrangement, plaintiff must show that the product (in this case, the right to use the Tastee-Freez trademark and tradename) could not be obtained unless the prospective licensee also agreed to purchase the tied product (here, the supplies from defendants or their designated or approved sources). Fortner Ent., Inc. v. U. S. Steel, 394 U.S. 495, 497, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pac. R. Co. v. United States, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Times-Picayune Co. v. United States, 345 U.S. 594, 605, 614, 73 S.Ct. 872, 97 L.Ed. 1279 (1953). See generally Capital Temporaries, Inc. v. Olsten Corp., 365 F.Supp. 888, 891–892 (D.Conn.1973); Siegel v. Chicken Delight, Inc., 311 F.Supp. 847, 849–851 (N.D.Cal.1970), aff'd in part, rev'd in part, and remanded, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

■ Accordingly, proof of tying arrangements between Chicago TF and its licensees will be critical. Such arrangements may be established either through proof of the actual contractual provisions or by evidence that the licensees were required through dealings with the defendant to purchase from unwanted sources. See Abercrombie v. Lum's, Inc., supra 345 F.Supp. at 390. Here, the alleged tie-ins cannot be proven through the licensing agreements alone because those documents do not, on their face, constitute a tying arrangement. As noted previously, suppliers besides defendants and their approved or designated sources may be added, subject either to defendants' approval or proof of equivalent quality. See note 8 supra; Smith v. Denny's Restaurants, Inc., 62 F.R.D. 459 (N.D.Cal.1974); Abercrombie v. Lum's, Inc., supra 345 F.Supp. at 389–390. See also notes 6–7 supra.

This court also has mentioned the potentially great disparity between the relevant contractual provisions. As recognized by the court in Gaines v. Budget Rent-A-Car Corp., 1972 CCH Tr.Cas. ¶ 73,860, at 91,604 (N.D.Ill.1972),

"threshold factual distinctions as minute as they may be may have a vital bearing on the applicability of a

common legal provision and may very well inject an 'uncommonness' that fragments the class. It is the area of antitrust law in particular that is replete with narrow and finite terms of art, and violations thereof can often hinge on the slightest variation and the presence or absence of a solitary word in an agreement."

Thus, proof of the tie-ins will have to be developed from an investigation of each purported class member's dealings with Chicago TF. This may well lead to individualized evidence as to each licensee. See Smith v. Denny's Restaurants, Inc., *supra* 62 F.R.D. 459; Abercrombie v. Lumb's, Inc., *supra* 345 F.Supp. at 391. Cf. Lah v. Shell Oil Co., 50 F.R.D. 198, 199–200 (S.D.Ohio 1970). The proof might require fine lines to be drawn between entirely lawful persuasion and recommendation, on one hand, and illegal coercion, on the other. Hettinger v. Glass Speciality Co., Inc., 59 F.R.D. 286, 293 (N.D.Ill.1973); Lah v. Shell Oil Co., *supra,* 50 F.R.D. at 200. As defendants state, irrespective of the language in any particular license agreement, issues will arise as to whether Chicago TF coerced its licensees to purchase only from specified suppliers or punished those who bought from non-designated or nonapproved sources[9] whether designation or approval was reasonably forthcoming upon the licencees' request; or whether the designation, or refusal thereof, was done for valid quality control and trademark protection purposes. The answers to these questions may very well differ from licensee to licensee.

There appears to be proper unanimity in the federal courts for the proposition that when substantial differences may exist in the licenses or franchise agreements and when the existence of coercion must be determined on an individual basis, the "commonness" required by Rule 23(a)(2) is absent. See Abercrombie v. Lum's, Inc., *supra*; Lah v. Shell Oil Co., *supra*; Hettinger v. Glass Specialty Co., Inc., *supra*; DiCostanzo v. Chrysler Corp., *supra*; Gaines v. Budget. Rent-A-Car Corp., *supra*; Smith v. Denny's Restaurants, Inc., *supra.* As well-stated by the court in *Abercrombie,*

> "[t]he individuality of the proof would cause this suit to degenerate at trial into multiple lawsuits separately tried, exploring the relationships between each of [the purported class members] and the defendants on numerous alleged ties." Abercrombie v. Lum's Inc., *supra* 345 F.Supp. at 393.

Plaintiff argues that the existence of the alleged conspiracy provides the question of law or fact common to the class.[10] This contention is put to rest by the response of the court in *Abercrombie* to a similar contention:

> "Whether or not such a conspiracy existed, the restraint of trade which must be proven in a tying case is an agreement, express or implied, between *buyer and seller* . . . . Proof of a 'conspiracy' as suggested by plaintiffs would not establish the requisite agreement between buyer and seller, the gravamen of this case." Abercrombie v. Lum's, Inc., supra at

---

9. Although plaintiff charges that Chicago TF coerced its licensees into purchasing supplies from unwanted sources, plaintiff's deposition testimony and the statement of another Chicago TF operator show that these persons bought numerous items from suppliers not designated or recommended by defendant; that plaintiff freely chose to buy other supplies from the recommended companies and made no attempt to purchase these provisions from alternate sources. By reciting

this evidence, the court does not intend by any means to prejudge, or to indicate any orientation toward, the merits of this case.

10. Plaintiff also contends that the common question also is found in his allegation that the licensing agreements are substantially similar and constitute illegal tying arrangements. This argument is without merit, as previously discussed in the text.

391 (emphasis in original). See *id.* at n.9. Cf. DiCostanzo v. Chrysler Corp., *supra* 57 F.R.D. at 499.

The now famous Chicken Delight litigation in California, Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal. 1967), modified sub nom., Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969), after trial, 311 F.Supp. 847 (N.D.Cal.1970), aff'd in part, rev'd in part, and remanded, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), upon which plaintiff relies is distinguishable from the instant case on several grounds. The standard form contractual provisions in question there required all franchisees to purchase certain equipment, food products, and supplies *exclusively* from Chicken Delight, the franchisor. Further, opinions written during the course of that litigation do not suggest that franchisees purchased from sources other than Chicken Delight. *Compare* 311 F.Supp. at 851; 448 F.2d at 46, 48 n.4, with Smith v. Denny's Restaurants, Inc., *supra* 62 F.R.D. 459, and Abercrombie v. Lum's, Inc., *supra* 345 F.Supp. at 389–391.

Similarly, this court's previous opinion in Butkus v. Chicken Unlimited Ent., Inc., 1971 CCH Tr. Cas. ¶ 73,780 (N.D.Ill.1971), is not controlling here. First, only two contracts were being challenged there. *Id.* at 91,291. Second, there was no suggestion that the franchisees were allowed to or did deviate from the recommended sources of supply. Particular note was made that the evidence on liability would be identical and that only

the question of damages would require separate proof: *Id.* at 91,292.

### C. Rule 23(a)(4): Fair and Adequate Representation

The adequacy of the named plaintiff's representation of the class depends upon whether his interests are co-exstensive with those of the purported class. Hettinger v. Glass Specialty Co., *supra* 59 F.R.D. at 296. The adequacy requirement must be "strictly construed and stringently applied, since many absent class members will be bound by the judgment." *Id.* (citing cases). Judicial interpretation of Rule 23(a)(4) has developed "the very logical and valid proposition that one must be a member of the class he seeks to represent." Gaines v. Budget Rent-A-Car Corp., *supra* at 91,605. *Accord,* Matarazzo v. Friendly Ice Cream Corp., *supra* 62 F.R.D. 65; Feliciano v. Romney, 363 F.Supp. 656, 677 (S.D.N.Y.1973); Seligson v. Plum Tree, Inc., *supra* 61 F.R.D. at 346; McMackin v. Schwinn Bicycle Co., 354 F.Supp. 1154 (N.D.Ill.1973); Van Allen v. Circle K Corp., *supra* 58 F.R.D. at 564; Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29 (S.D.N.Y.1972).[11]

The basis for this rule is clear. Present Tastee-Freez licensees have a substantial interest in the continued economic viability of the defendants. As a former operator, however, plaintiff's chief concern is the recovery of maximum damages.[12] Further, the protection a former licensee may render the class "is bound to suffer if not in zeal-

---

11. Interestingly, the *Seligson* and *McMackin* decisions cited in the text overruled prior opinions in the same cases by the same judges tentatively certifying a class action. See Seligson v. Plum Tree, Inc., 55 F.R.D. 259 (E.D.Pa.1972); McMackin v. Schwinn Bicycle Co., 1972 CCH Tr.Cas. ¶ 74,220 (N.D.Ill.1972).

12. Although plaintiff does seek injunctive relief, this, presumably, is attributable to his inclusion of present licensees in the purported class.

The existing licensees' interest in the continued financial strength of the defendants overcomes plaintiff's argument that, because of the consent decree entered into by the Federal Trade Commission, Tastee-Freez, and several area franchisees, not including Chicago TF, see Consent Order, FTC File No. 701–0079 (December 22, 1972), both present and former licensees would be interested primarily in damages.

ousness then perhaps in overzealousness." Gaines v. Budget Rent-A-Car Corp., *supra* at 91,605.

Plaintiff argues that antagonism between himself and any other class member may be solved by allowing the objecting class member to "opt out" of the class or to enter an appearance through his own counsel under Rule 23(c). As the court in Free World Foreign Cars, Inc. v. Alfa Romeo, *supra*, accurately responded to a similar contention, this suggestion is "no answer . . . . The machinery of the Rule, with its attendant expense, should not be brought into play unless initially plaintiff, who has the burden of proof, justifies its application." 55 F.R.D. at 29 (footnote omitted). *Accord,* Matarazzo v. Friendly Ice Cream Corp., *supra* 62 F.R.D. 65.

■ Plaintiff has offered no compelling reason for this court to deviate from the general axiom that former class members are not adequate representatives of the class. Thus, the fact that plaintiff no longer operates a Tastee-Freez store renders him non-representative of the purported class and makes the fairness and adequacy of his protection insufficient under Rule 23(a)(4).[13]

## II. Rule 23(b)

Although it is clear from the foregoing that plaintiff's suit fails to satisfy any, let alone all, of the Rule 23(a) prerequisites for a class action, nonetheless, this court deems this additional comment to be appropriate in disposing of plaintiff's remaining contentions.

Unfortunately, plaintiff has not made clear upon which subdivision of Rule 23(b) he relies, for, while the amended complaint seems to invoke each of the subparagraphs thereof, his memorandum only addresses Rule 23(b)(3). Fortunately, little discussion is necessary to

demonstrate the inapplicability of each subdivision.

Since the merits of each purported class member's claim turn upon an examination of the relationship between Chicago TF and the licensees, separate actions would not "create a risk of inconsistent or varying adjudications," Rule 23(b)(1)(A); for the same reasons, "adjudications with respect to individual members of the class . . . would [not] as a practical matter be dispositive of the interests of other members . . . ." Rule 23(b)(1)(B).

■ Plaintiff fares no better under Rule 23(b)(2) because it is now established that, where the predominant reason for instituting suit is the recovery of money damages, as is the case here, the action is not suitable for treatment under that provision. See, e. g., Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968); Coniglio v. Highwood Services, Inc., 60 F.R.D. 359, 363 (W.D.N.Y.1972); Alpert v. U. S. Industries, Inc., 59 F.R.D. 491, 499 (C.D.Cal. 1973); Goldman v. First Nat'l Bank of Chicago, 56 F.R.D. 587, 593 (N.D.Ill. 1972); Advisory Committee's Note, 39 F.R.D. 73, 102.

Lastly, this court's discussion of the Rule 23(a) criteria forecloses a conclusion under Rule 23(b)(3) that "questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods" of adjudication. Rule 23(b)(3).

## III. Conclusion

For the reasons that the alleged class is not homogeneous; that the more appropriate class is not so numerous as to be unmanageable; that plaintiff's claims are not typical of the class; that plaintiff, *having ceased operating a Tastee-*

---

13. Although Rule 23(a)(3) has not been specifically discussed here, the court in *Gaines* also noted that the named plaintiffs' status as a former franchisee also disqualified them under that provision. 1972 CCH Tr.Cas. ¶ 73,860, at 91,605.

Freez store prior to filing this suit, cannot fairly and adequately represent a class composed of existing Tastee-Freez licensees; that questions of law and fact common to members of the alleged class do not predominate over individual questions; and that a class action is not superior to other available methods for the fair and efficient adjudication of the controversy, this lawsuit cannot be certified as a class action. Accordingly, defendants' motions to strike the class action allegations of the amended complaint are hereby granted.

